2001 OK CIV APP 79

Bruce McKEEVER, Plaintiff/Appellant,

v.

STATE of Oklahoma ex rel. DEPARTMENT OF PUBLIC SAFETY, Defendant/Appellee.

No. 95,411.

Court of Civil Appeals of Oklahoma, Division No. 3.

April 5, 2001.

Certiorari Denied May 22, 2001.

Gerald C. Dennis, Antlers, OK, for Plaintiff/Appellant.

J. Robert Blakeburn, Department of Public Safety, Oklahoma City, OK, for Defendant/Appellee.

## OPINION

GARRETT, Judge:

¶1 Appellant, Bruce McKeever, was involved in an automobile accident. A Highway Patrol Trooper was dispatched to the scene. When the Trooper arrived he found one car [the Cunningham vehicle] engulfed in flames. The other car was McKeever's, and he was pinned in it on the driver's side. The Trooper was unable to rescue Cunningham. It took the rescue people more than an hour to get McKeever out of his car. McKeever was badly injured and was taken to the emergency room of the local hospital.[1] The Trooper was told by an eye witness that McKeever had been driving his pickup on the public highway and he veered to the left and collided with the Cunningham vehicle.

¶2 Appellee, the State of Oklahoma ex rel., Department of Public Safety, revoked McKeever's drivers license. McKeever filed a petition in the district court to vacate the order of revocation alleging it was accomplished in a manner that was contrary to law, or in the alternative, to modify it for hardship reasons. The reasons it was "contrary to law" were not stated. The trial court

---

1. When asked what injuries he sustained in the accident, McKeever testified:

   I had a small cut above the hairline on my head, a cut on my chin, both the bones in the right arm were broke, clavicle was broke, couple of ribs were broke, couple of vertebra in my back were cracked and I had a cut on my right leg that wasn't too severe, and then my elbow was broke. And my left leg, the femur was broke in it; one of the bones below the knee from the knee to the ankle was broke. My foot was broke in two places and my kneecap was broke and there was a severe cut over my leg that they said considered taking my leg there. That was where I was losing all the blood from, which it took three surgeries to get that closed back up but the knee was pretty much totally wiped out. But I think that's all, sir.

upheld the revocation without modification. McKeever appeals.

¶ 3 The Trooper testified that he asked the nurses at the hospital to tell him when it would be all right to talk to McKeever. At approximately 10:00 o'clock p.m. a nurse told him it was all right to talk to McKeever. The Trooper read the implied consent advisory to McKeever from the official card that he had with him. The advisory contained language which advised McKeever that he had been arrested and asked him if he would take the blood alcohol test. Also, if his blood alcohol content was in excess of the statutory limit, his driver's license would be revoked. The Trooper testified McKeever agreed to take the test and his blood was then drawn by an emergency room registered nurse. She only used the kit supplied by the Trooper. The test revealed a blood alcohol content of .15g/100ml.

¶ 4 McKeever testified that he has no memory of being read the advisory, being told he was under arrest, or agreeing to or rejecting the test. He contends his blood was taken while he was unconscious or in a state of shock, therefore he was unable to consent to the test or to decline the test. The evidence was conflicting with reference to whether McKeever was in shock or whether he was unconscious.

¶ 5 McKeever contends he was not placed under arrest; he did not have the mental capacity to consent or decline to take the test required by 47 O.S. Supp.1993 § 753 (since amended with amendments not material here); and proper procedure was not followed in obtaining the blood sample.

¶ 6 In *The Matter of Krahn*, 1977 OK 168, 569 P.2d 982, the Court cited *Hoban v. Rice*, 25 Ohio St.2d 111, 267 N.E.2d 311 (1971), with approval. The court said:

> The licensee's words, acts, overall conduct and other manifestations of a willingness or unwillingness to take the sobriety test will be considered by the *trier of facts* in determining whether there was a refusal. The determination will be based on an objective standard, not a subjective standard, such as the state of mind of the licensee. The subjective state of mind of the licensee cannot control the outcome of the proceedings, and a police officer is not required to know the state of mind of the person arrested and determine whether such person understood he was refusing to submit to the test. To require that would place an impossible burden on the arresting officer.
>
> Appellant's lack of recollection is not inconsistent with his refusal to take the sobriety test. It is possible for a licensee to be in such a state of intoxication that he does not understand what is happening, and, at the same time, by words, acts and general conduct to manifest an unwillingness or outright refusal to take the test. Although he may later have no memory of what occurred, his mere statement that he does not remember anything that happened is insufficient to show that he did not refuse to take the test.
>
> If we were to adopt appellant's theory, a licensee could refuse the test prescribed by R.C. 4511.191(A) and then, at a Municipal Court hearing, testify that he does not remember anything. The result could be to nullify the effect of the statute.
>
> We cannot subscribe to the defense of 'too drunk to understand' as a means of nullifying the effect of the implied-consent statute without additional legislative requirements that the refusal be intelligently, knowingly, and intentionally made. [Emphasis added].

In *Krahn*, there was *undisputed* medical evidence that the licensee was unable to give consent. That fact situation is clearly distinguishable from this case. Here, the Trooper testified that McKeever was "alert and conscious the whole time I was talking to him", "he answered all my questions" and was capable of giving consent to be tested. One of the medical doctors testified that the emergency room registered nurse who drew the blood was capable and a "very good documenter". That nurse listed McKeever as "awake, alert and responsive" at the approximate time McKeever gave consent for the test. However, the emergency room doctor testified "My estimate of this man's physical condition was he was in shock. And to me, I'm not a lawyer, but I would not expect

someone to be able to give me consent for surgery or to be able to make a decision about anything that requires any type of mentation at all. They just don't have the capability." However, the emergency room doctor also testified McKeever was capable of answering certain questions, and others he was not. McKeever's personal doctor gave expert testimony in his favor.

¶7 Therefore, in contrast to *Krahn*, there was conflicting evidence here as to whether McKeever had the capacity to give consent to the test. The trial court, who sees the witnesses, observes their demeanor, and hears their testimony is in a better position to judge the true facts than an appellate court is by an examination of the record. *In re H.M.*, 1998 OK CIV APP 176, 970 P.2d 1190. See also, *Krahn, supra*. The trial court either determined that McKeever gave the requisite consent to submit to the test or that he was too drunk to make a decision. Some of the evidence indicated that he had 8 or 9 beers. In entering judgment the court did not give the specific reason.

¶8 Next, McKeever contends he was not under arrest when the consent was given and arrest is a prerequisite thereto. The Trooper testified he informed McKeever he was under arrest and that if he took the test for blood alcohol and failed, his driver's license would be revoked. The trooper did not physically restrain McKeever or put him in jail. McKeever was allowed to be further treated by medical personnel. 47 O.S. Supp. 1995 § 751(D) (since amended with amendments not material here) provides in pertinent part:

Any person who has been arrested for one of the offenses listed in subsection A of this section who is unconscious or injured and who requires immediate medical treatment as determined by a treating physician may be released on his own recognizance for medical reasons by the arresting officer. The arresting officer who releases an arrested person on his own recognizance must indicate that he has done so on the face of the citation. Any person released on their own recognizance for medical reasons shall remain at liberty pending the filing of charges.

¶9 McKeever, in arguing that he was not legally arrested, makes much of the D.U.I. ticket which was [or was not] issued by the Trooper. Apparently, McKeever takes the position that absence of a traffic ticket or failure to show delivery of the ticket constitutes proof, as a matter of law, that an arrest was not made. We disagree. A traffic ticket is not an arrest warrant. A peace officer, in this case a highway patrol trooper, is not a judge and is not authorized by law to issue an arrest warrant. In fact, the actual arrest of a suspect for a traffic related offense almost uniformly takes place prior to the issuance of a traffic ticket. Whether such a ticket has been issued has little to do with the validity of a test for blood alcohol content. The real issue is whether the mandates of the implied consent statutes have been followed. See 47 O.S.A. §§ 751–753. Did the Trooper reasonably think the subject was driving a vehicle, or was he in the actual physical control of a vehicle, while under the influence of alcohol? Was the subject under arrest? Was the implied consent law communicated to the subject? Did the subject consent to the test? Cf. *State v. Shepherd*, 1992 OK CR 69, 840 P.2d 644. We fail to find the traffic ticket in the appellate record before us. Whether it was endorsed as provided by 47 O.S.A. § 751D may not be determined. Therefore, for whatever its effect may be, we cannot examine that document. Of course, the duty to provide a record is on the Appellant, not the Appellee.

¶10 The court had evidence before it that the Trooper arrested McKeever, and evidence of McKeever's condition, and apparently ruled McKeever was under arrest at the time. This Court will not reverse the trial court's findings if there is any competent evidence, or any reasonable inference to be drawn therefrom, which tended to support findings. *Davie v. State ex rel. Dept. of Public Safety*, 1995 OK CIV APP 80, 898 P.2d 180.

¶11 Finally, McKeever contends DPS did not follow proper procedure because it failed to produce evidence that the emergency room nurse was qualified to draw McKeever's blood for the test. The record

fails to sustain this argument. While the emergency room nurse was not called to testify, she was referred to as "nurse" by the emergency room doctor, and, documents admitted into evidence contained her signature followed by the designation, R.N. An R.N. is qualified to draw blood.

¶ 12 McKeever states there was no showing the blood was drawn in accordance with proper procedures. However, the record shows that blood was drawn by a registered nurse who used only the equipment provided in a special kit carried by the Trooper. The blood samples were then mailed to Oklahoma State Bureau of Investigation for testing. McKeever did not present evidence regarding the blood sample or how it was not in accordance with proper procedure. DPS, in contrast, presented evidence showing the procedures used and their conformity with proper practice. The order appealed was supported by "any competent evidence".

¶ 13 AFFIRMED.

¶ 14 HANSEN, C.J., and BUETTNER, P.J., concur.